Case No. 13-1308, United States Postal Service Petitioner v. Postal Regulatory Commission. Mr. Belt for the petitioner, Ms. Kiersevang for the respondent. Good morning, Your Honors. Good morning. And may it please the Court. The issue for the Court today is actually fairly simple. The Postal Service is subject to a price cap, which by its terms imposes an inflation-based limit on increases in rates. And the issue is whether it limits things other than increases in rates. Specifically, does it cover changes in mail preparation requirements that alter or tighten the eligibility for using a certain service, but don't change the price charged for that service? Well, how about changing the cost of doing it? If it changed the cost in terms – yeah, it does not cover that either. I mean, this is a price cap that applies to prices, and prices and costs are inherently different. And I have sort of two points about that. One is that costs – costs are what are incurred by customers. Prices are what we charge or what money is received by us. The costs are often – if costs go up – and the example I used in our brief was if I sold something at a corner store, say I sold milk for $4 a gallon, and then moved my store 30 miles west, still sold the milk for $30 a gallon, it would cost you more if you lived around the corner from where my store was to buy that milk. But the price hasn't gone up. And that's the difference. The costs to mailers can be – are often costs incurred that are paid to third parties. Prices are what's paid to us. So that's one point. And the second point, it would be impossible to administer a cost cap because the cost – at least the cost cap in the 45 days that Congress has set forth for resolving the price cap issues, because costs to mailers, for example, are going to – they're going to change from mailer to mailer. I just want to ask you the question through the Chevron lens that we look at this. So you think this statute unambiguously precludes the commission from interpreting rates to include changes in discount practices that produce – that result in higher costs of mailing? Yes. Could you agree that's the question, right? Yes. So explain that to me. It doesn't define the word rate except to say it includes fees, right? Right. So rates and fees are prices. So what in the statute unambiguously precludes the commission from doing this? Well, there's two – well, I suppose – That's the question, right? That is the question, absolutely. What unambiguously precludes it is that rates and fees, for that matter, have plain meanings. So you don't think there is any – you think this is just a Chevron 1 issue? I think it is a Chevron 1. We have a Chevron 2 argument as well, which is why is this – if rates could be interpreted to mean something other than prices, why would this particular mail preparation change be singled out as opposed to equally substantial or even more substantial changes that impose real costs? As an example, closing retail facilities, closing processing centers, changing delivery standards, slowing down mail delivery. We've done all those things. The commission has never held any of those were price changes, even though they would change the cost calculation or the value calculation for customers. The price cap is just about prices. But they don't affect the price paid by customers. That is correct, and neither does the rule here. The rule here doesn't affect the price paid by customers or even the service we offer. What it is is it tightens the eligibility rules. But you reclassified, and it does affect the price paid. We didn't – well, we didn't reclassify anything. We changed the requirement. This is like if a bank tightens the eligibility requirements for a loan. It does not raise interest rates. It looks like you effectively reclassified. Well, we haven't effectively reclassified, Your Honor. We – both the rates and the services we offer were before – were the same before and after we imposed the barcode requirement. If I'm using the basic – what do you call this? If I'm using – if I'm using the basic intelligent barcode under the old system and I don't want to upgrade to the full service, isn't my cost of mailing go up? I can't use the basic anymore, right? If you choose to do that, you will have to use a different product, sure. Right. But that itself is – It's going to cost me more to mail my letters. But that is not a price increase. That is – that is your choice. The prices are the same. Let's look at it in a different – But you've eliminated – I can no longer choose the basic. It's gone. Well, okay. On that score, we made the same decision the year before, and that wasn't held to be a rate increase. We changed the standard. We changed the – we changed those kind of requirements all the time. Maybe they were wrong the year before. Maybe they should – I don't know about the year before. Just answer this one. Just tell me – so if I'm using the basic and I don't want to upgrade, you agree I can't use the basic anymore, correct? Well, there is no basic. We have an automation rate, and it is true. We changed the standard. That's your – Basic intelligent barcode. That's what I've been using. Basic intelligent barcode. Right, and that used to entitle you to automation rates, and we changed the rule, and that would not entitle you to automation rates. That is correct. And I don't want to upgrade, so it's going to cost me more, right? That's true, and it arguably could cost you more if you did want to upgrade, which is part of the problem is that you could – you could incur a cost, but you're not paying a higher rate. We are not changing the rates. We are reclassifying the products. And let me – that is – well, no, we're not reclassifying the products, but we are changing the service standards. And let me be clear about that. There are a host of statutory provisions that cover those kind of changes. They're not part of the price cap. The same statute that imposed the price cap either expanded or introduced different statutory provisions that cover that situation. For example, there are provisions about classification changes that are – any proposal to reclassify a product is – has to go through pre-implementation review by the commission. If we change our service standards, the classification stuff is under 3642. Service standard changes under 3661 require – If a mail piece goes from one rate cell to another rate cell in the manual, that's a rate change. If a mail piece goes – it's not – Your Honor, it's not a rate change. It's not a rise in one rate cell and then it's changed. It's that you're paying a higher rate. You're not paying a higher rate. We're requiring you to do something different. Your Honor, if I sold you something – It's the same mail piece, right?  It's the same mail piece. It's the same. But you're paying a higher rate. Right. And – but you're not – you're not paying a higher rate. You're – we're saying that that mail piece – we're changing the standard. Which we're entitled to do. It's a regulation of the Postal Service. The automation rates have never been defined in terms of a specific type of barcode. It's always been subject to change by the Postal Service. And what is different about this law, the 2006 law, the law that introduced the price cap, is that in the complaint process, it actually sets forth an avenue for mailers who want to challenge those regulations to do so. There would be no need to put that in the law if everything we do is covered by the price cap. And that's – price cap is about prices. It's about changing the price. Let me ask you a question about the change that was made to the domestic mail manual. So there were commenters, weren't there, who argued that this was effectively a price increase when you made that change, right? They argued their costs would go up, yeah, to comply with it. Does the commission as a regulatory – you know, under the regulation in the statute, does the commission have any standing to intervene at that point? They can file comments at that point. They don't – our regulations are not subject to pre-implementation review by the commission, but they can be challenged through the complaint process in Section 3662. Challenged by whom? By a mailer, by an officer of the commission, by a member of the public. I mean, there's no – I mean, the commission itself can initiate the complaint process, essentially. And at that point, they can decide, is that the type of change, is that change reasonable? And that goes to another point about the price cap. The price cap is a mathematical formula. We're plugging numbers into a formula. If they exceed the rate of inflation, they're invalid. The type of arguments I'm hearing today are really balancing type tests that are more appropriate for the many other statutory tools that the commission has at its disposal. These are not price changes. These are changes – these are eligibility changes. Okay, let me ask you a different question. So one of your arguments is that the commission erred by assuming that no one would switch, right? That is why – that's our – yes, that is our argument, that it overstated the impact of this supposed price change. Yeah. So in their brief, the commission says that even if it assumed a 96% – even if it assumed a 96% adoption rate, the change would still trigger the price cap. And you didn't answer that anywhere. And if that's true, doesn't that mean even if the commission should have assumed some level of adoption, that it wouldn't have made any difference? Well, actually, our main argument on that – No, no, we just answered this question. To answer your question directly. Yeah, just answer that question. If 4% of – if you accept the idea that this was a rate change, even though it didn't change any rates. Yeah, let's assume it's a rate change. Well, assume it's a rate change. And it triggers the price cap. If 4% did not convert, then that 4%, I guess, would suffer a rate increase, even though we didn't increase any rates. No, that's not my point. It is a – let's assume it's a rate increase. Then the question is, does it trigger the price cap, right? Well, if it's a rate increase, it triggers the price cap. There's no question. Well, I mean, does it exceed the price cap? On its own, it wouldn't, but in conjunction with other rate changes we made in September, it would. It's a 96% question. I believe that if 96% converted and 4% did not, then it would have exceeded the cap. You agree with that? Yeah, but I also think it's a rate change. How can you win then? I don't understand. Because they have overstated the impact of the change in general. Their argument is that we have to assume that nobody would have converted, even though they can see that that's not even possibly the case. But what they're saying here, even if 96% converted, it would trigger – it would exceed the price cap. Right, but that's not being – we were challenging the idea that they are overstating the impact of the price cap. I mean, they came up – their holding was that we have to assume for price cap purposes that if you did that, nobody would convert, which is in contrast to what happened in the situation when we did. Well, but it is what their regulations say. Well, I'm not sure it entirely says that. And on top of that, that's not how the commission – It says – it says – it says wherever possible, the adjustment shall be based on known mail characteristics or historical volume as opposed to forecasts. Right. And the commission, when we introduced the price incentive, the discount for using full-service intelligent mail, the commission treated that as a rate decrease. Based on what? Based on forecasts, on what it expected mailers would do. Or if you didn't want to look at its forecast, they didn't say that it was forecast. They said it was based on our knowledge of the history and our knowledge of the mailing industry. You would apply the same standard here. That's what we said when PostNet, when we changed the barcode requirement before, which once again, when we changed that requirement before, even though not everybody complied with it, even though only 96% did, the commission did not hold that it was a rate increase. So how they hold it now is completely unexplained. Their only explanation is – But if you could answer Judge Tatel's earlier question, is that even if we grant that 96% would change from basic to the full automation, it would still exceed the price cap. That's only if you reject the – or if you accept the argument that the price cap covers not price increases, but changes anything that imposes cost, anything that changes service standards, or anything other than what the language of the statute says. If you accept that, then absolutely that's true, that we have exceeded the cap. But the problem with that is it impossible to limit that to this case, that under the commission's view, everything we do is a price increase. If we move from six-day delivery to five-day delivery, under their thinking, that would be a price increase. Or if we expand delivery, that's a price decrease. How would you even administer a price cap like that? But isn't the question before us whether – and we're reviewing this order – and whether this order is arbitrary or capricious, right? That's part of our argument. Part of our argument is that you cannot apply a price cap to something that isn't a price change. But listen to me. They're not writing a regulation here. We're not reviewing a regulation or something that's going to guide future actions, right? We're just reviewing this action. This action held that for the first time, that something other than a price change is covered by the price cap, which by its terms covers price changes. I mean, that's our principle argument, that the statute is about price changes. There are many, many ways that Congress gave the commission to regulate our activities for things other than price changes. The price cap is not one of them. That's our only argument. The price cap is a formula. It is not designed to engage in the type of inquiry about, well, what is the effective cost you're imposing by tightening this requirement or that requirement? It is a formula. It is about price increases. And that's not an arbitrary and capricious argument. That's violating the plain meaning of the statute argument. We do have an arbitrary and capricious argument because they have not explained, even though, yes, they were ruling just in this case, it is to guide all of our future cases. What are we supposed to do with this information? Are we supposed to assume that every action we take is a price increase? We'll be filing price increase cases every two weeks. We are always changing our rules. Okay. Thank you. Thank you, Your Honor. May it please the Court. I'm Dana Karasong for the Postal Regulatory Commission. Respectfully, the prices here did change. There used to be a price, an automation price for basic barcodes. That price is gone. You can either pay more to send your mail through non-automated rates, or you can pay less to send it with the intelligent full service, the full service intelligent mail barcode. But nobody is going to pay that basic automation rate anymore. Those rates are gone. And that makes this a price change. So why didn't the commission then intervene at the time that they undertook the rulemaking to the domestic mail manual and say, you can't do this, this is a price increase? Well, that's not the way the process typically works. So for price increases every year, the Postal Service brings forward all of their changes, and we look at them. And at that time, people raised that this other change that was happening in parallel, I believe hadn't gone into effect yet, but the other change that was happening in parallel would affect a price increase, and the commission looked at that and agreed and said, you know, the Postal Service has to pick one or the other. And in doing that, in making this decision, we're applying this rate cap regulation, and I'd like to clarify what the formula is. The formula is we're going to look at how much it's going to cost next year to send last year's mail. That's how the Postal Regulatory Commission decides if there is a rate change, decides whether the price cap has been exceeded, right? How much will it cost next year to send last year's mail? That's the formula that everybody, including the Postal Service, or virtually everybody, wanted at the time. Because if we start talking about how much next year's mail is going to cost, we don't know what that is, right? Because that gives us these weird prediction problems. So we look at how much it's going to cost next year to send this year's mail. And looking at this year's mail, that mail with the basic barcode would go under the higher non-automated rate. Well, I mean, what their argument is there are all kinds of rules with respect to which they have the right to change, modify, that will cause users to pay more or less depending upon how they change it. You've essentially said you can do whatever you want if you can find an impact on users. That doesn't make sense at all. So I want to split that out. What we're not talking about is cost to users. What we're talking about is how much the Postal Service is going to charge this year to send last year's mail, right? We're talking about the charges. And here, there was a rate for basic automated mail that nobody gets to pay anymore. So that's how we know in this case it's a rate change. It would be a trickier case, although, you know, the Postal Regulatory Commission addressed it, and we would still win. It would be a trickier case if they hadn't eliminated a rate. But here, they did eliminate this rate. Now, the other piece of this. Why is the elimination of a rate a change? I'm sorry? Why is the elimination of a rate a change in a rate? The rate is just gone. Right. The rate is gone. Because their manual practices have changed. So there is no longer this possibility. It would be different if you said, well, you know, we used to charge you $43 for automation. Now we're going to charge you $53. That I can understand. But that's not what this is. This is a regulation of uses, including, you know, we're just eliminating. This is not available. We're not doing it this way anymore. So that's not even there as a rate to think about. It's just gone. Right. So when we plug that into our formula that everybody endorsed, and we say how much is it going to cost next year to send this year's mail, the mail that would have gone into that rate. If there isn't any automation rate there, I don't understand the plug-in. That's like a rule change, which has impact on users. There isn't an automation rate. So you can't plug it into this year if it's not there. Right. So the Postal Regulatory Commission does this calculation, where it says how much is it going to cost next year to send this year's mail. And when it gets that mail that went last year under this automation rate, it's not going to go under that rate next year because that rate's gone. So it does a smart calculation. This is what the Postal Service recommended when we first created our rule in 2007. Does a what calculation? What calculation? It's a smart calculation. S-M-A-R-T? Yes. Smart? That's my characterization. So we're actually looking at each piece of mail that went under the rate that is no longer there, and we say, okay, how much would you have to pay to send this piece of mail under next year's rates? So we get this, how much is it going to cost next year to send this year's mail? And that's the rate change. So why did you say that it's significant that the basic intelligent rate was eliminated? Suppose you said that was a big factor in this, right? I'm sorry. I think that makes it really easy here to see that a rate was changed. Well, I'm going to assume the difference because let's assume that instead of eliminating it, they left it there, but to give mailers a greater incentive to switch to intelligent rate, it left it there but reduced the discount. So that means that everybody who sticks with that this year will be paying more, right? Because they won't get as big a discount. That's right, Your Honor. That's also a rate change. On your theory, why would that make any difference? Your theory, that would be a rate increase, right? Yes, Your Honor. So my theory is that we look at – I'm sorry, I didn't mean to cut you off. I just don't understand why you told us it's in any way material that the basic intelligent rate was eliminated. I'm sorry, Your Honor. Under the regulation, I think it doesn't matter. The calculation is the same. It's what it's going to cost next year to send last year's mail. That's the regulation that we get deference for. I think that it makes it really clear that there used to be a rate and now the rate is gone. Then again, what's your answer to Mr. Belt's argument that Judge Edwards was just pursuing with you, that if you're right about this, basically anything the Postal Service does, closings, closing – What's not subject. – that affects costs is now viewed as potentially triggering the cap. So I might have introduced this confusion when I said how much it's going to cost next year to send last year's mail. That's not what I mean. I don't mean how far you're going to have to drive to send the mail, what your mileage is going to be. What I mean is how much is the Postal Service going to charge next year to send last year's mail. They eliminate a postal office. They do things like that. That doesn't change the charges. How do you explain the page? Whatever the case is, it seems perfectly inconsistent with what you did here. Yes, so what we look at when we say how much they're going to cost next year to send this year's mail, and we plug that in to this equation, we say, okay, some of this mail would go under different rates next year. If the change is really small, and the paradigmatic example was a change about the thickness of rubber bands, we said we're not going to say that all of those bundles of mail that had rubber bands around them that weren't thick enough last year are going to – that exceeds the rate cap because they wouldn't qualify. So if the change is small enough, we don't do this. What does that mean? What does small enough mean? Yeah. Well, so we're talking about things that go to the basic characteristics of the mailing, things that are going to – that it's really not reasonable to think, like with the rubber bands, that everybody's just going to make the change. Now, with PostNet – Are there really requirements for how big the rubber bands have to be? I'm just curious. Is that true? I'm sorry, Your Honor, I didn't hear you. Are there requirements for how thick the rubber bands have to be? Yes, Your Honor, I believe that is in the mail manual. No kidding. I'm not sure how much rubber bands are used anymore. They may now have been replaced by shrink wrap. But at one point, there were regulations about rubber bands. So we don't get involved in that kind of thing. How many pages were the rubber band regulations? Do you know? I'm sorry. I don't know. But because we don't get involved in that kind of thing, what – and the PostNet change was like that, right? No rate was eliminated. And the Postal Regulatory Commission didn't think that looked like this kind of big change, right? Your mail had a barcode before. It had a barcode after. It just changed exactly what that barcode looked like. But you could handle your mail in the same way. That's not what's happening here, right? What's happening here is not only does this barcode have a lot more information than the barcodes used to have. That barcode now is going to tell you who – not only who the sender is, but who received it, which post office that entered the system, a lot of information. But that piece of mail with that barcode gets put in a tray that has a barcode that tells you every piece of mail in that tray, which goes into a flag. How do you draw the line on your authority? Because the more you talk, the more I'm unclear. I don't see any limitation. I mean, I don't think respectfully that what the Commission did here – and there are time constraints. I understand they have to move fast. But it's not brilliantly done. I mean, I can't see the line that we're talking about that distinguishes between what you think is covered and what you think is not. I can't think of anything that's not covered under what – under your description of the Commission's power now. It seems to me everything's covered. So what we're talking about for rate changes, if it's going to make a significant change – and the Postal Service said this was. And I don't know what significant means. Significant in whose eyes? And we're fleshing that out. In whose eyes? That's what I mean. You're fleshing it out. And my instinct is the more I listen and the more I read these cases, I don't think you've fleshed it out in a way that I can comprehend, at least as one judge. And maybe that's the kind of thing you send back and say, folks need to flesh this out some more. I really don't know what you're talking about. You say significant to whom? You? The public? The users? The service? That's one thing I don't get. You blow up one case as being, wow, that was just rubber bands. Rubber bands, I suspect if you have enough of them, can be costly. I don't know. But I don't get it. I don't know where you're drawing the line here. I really don't. So what the Postal Regulatory Commission said is we're looking at the basic characteristics of the mailing. In the PostNet case, the mailing is basically the same. It just – we're just changing what the barcode looks like. Here, we're changing – we're making major changes to the way you handle and process the mail. There was another example in this same decision. But you agree this could be fleshed out better, right? So this is – You agree this could be fleshed out better? This is rulemaking through adjudication, so it's looking at the specific cases before it. In this particular – It doesn't matter. If you end up with a rule with respect to which you're seeking Chevron deference, it has to pass a certain standard of comprehensibility. This has to be fleshed out more, right? You agree? It could be done better. I know you're not asking for us to send it back, but you agree it could be done better so that some weak mind like me could kind of follow you? Yeah? Your Honor, this – I would have thought from reading your brief that you might have – one answer you might have given to Judge Edwards is you're really only interested in changes that would actually be significant enough to influence consumer behavior, right? I mean, if it doesn't influence consumer behavior, it's not going to have any impact on the charges, the amount the Postal Service charges, right? So maybe that's what the rubber bands are. Be careful what you answer. Is that what you would say? Is that what you're saying? I do think that one factor is whether it's going to influence the mailer behavior. One factor? Right? What we're talking about are the cases. Wait, wait, wait. Let's keep following that. One factor, and what are the other factors? Which is precisely my question. So we're talking about – I think looking at this particular opinion is really useful, this order. Talking about the basic characteristics of the mailing, and there was one example which was about the height of stacks of mail. And the Postal Regulatory Commission said, no, we think that senders can make this change to the height of their mail. Everybody's going to make that change. Whereas this change, this intelligent, full-service barcode change, that's a major change. The Postal Service acknowledged it's a major change. It's going to be something that we don't think that everybody is going to make. So we're looking at whether this is the kind of basic characteristic of the mailing where we think that it's not – we're not in the area where everybody's just going to make the change, like with the rubber bands. Now, taking a step back to our regulation, right, and our calculation in the regulation for which we get deference, we're looking at how much it's going to cost to send – how much it's going to cost each year to send last year's mail. And here we really do see that it's going to cost more. So you're saying that the commission should be able to forecast future behavior, but the Postal Service can't? Or that you can for this purpose, but you can't when you're – you know, if you've got historical volume data, you have to use that and you can't forecast whether volume data might change. But here, for these purposes, the commission can forecast future behavior. So everybody agreed that the right way – virtually everybody agreed that the right way to calculate the price was to look at how much the price changes, how much it's going to cost next year to send last year's mail. Now, we do apply a reasonable rule. We don't reach out and touch the rubber bands in every little thing. But if it's a significant change where we do think that mailers are going to end up paying a different rate, that it wouldn't make sense to treat that mail as going under the same rate, and here that's, I think, really obvious because that rate is gone. The mail is definitely not going under that rate. Then, yes, we do make that kind of determination about whether – Spoken counsel, has the commission defined the significant test that you're now espousing today? So the order talks about the basic characteristics of the mailing. But that test – I mean, I don't mean to sound like I'm quibbling, but seriously, have they defined a significant test? The test is the basic characteristics of the mailing. Does it go to the basic characteristics of the mailing? They flesh that out through these adjudications saying, you know, envelope height, no. Totally changing your mail stream, yes. And if the Postal Service wanted a rulemaking to get more clarity on what that is, there's a process for them to request a rulemaking. They haven't done that here. So we've been going forward. Well, that doesn't foreclose them from challenging what they now face. That's true. Right. But this is being fleshed out. This has been fleshed out through adjudication. What we're saying here is that in this case, we're totally changing the way you handle the mail stream. So this is a change to the basic characteristic of your mailing. If there are no further questions, I'll ask the question out of the commission. I think Ms. Travell used up all her time, right? Okay. You can take two minutes. Thank you very much, Your Honor. I'd like to make two points. First of all, this test that the commission is now announcing about how much does it cost next year to send this year's mail is not really their test. We make major changes throughout the year that would absolutely impact how much it costs to send next year's mail, and that has never been before treated as a rate change. But in this case, isn't that exactly what the commission did? It assumed, it asked how much it will cost to send this year's mail next year. They assumed? That's exactly what it did. Now, if you're arguing that that's inconsistent with what it's done in other cases, okay. But that is what it did here. It is what it purported to do here. I don't understand why you say purported. Well, what it did was not, what it didn't do was apply the language of the price gap. These questions take us beyond that. Assume you're wrong about that. Assume this is a price increase. I thought that's what you were talking about at this point. Yeah, that I was talking about, that their test for determining whether something triggers the cap is itself arbitrary. That is true. But as for where one draws the line, I want to once again recommend the line should be drawn at did we change prices. If we didn't, that does not mean we're free from regulation. There are a host of regulatory provisions that govern the Postal Service. The Commission has many tools in its toolkit to regulate us. The complaint process gives it tremendous authority. What's your reference point when you say change prices? What are we looking at? If the numbers change. If we charge more for a service than we charged before. We didn't do that here. We did change the eligibility rules. We tightened them. In the same way as the example I used at the beginning of my argument, if a bank tightens eligibility rules for a loan, it has not raised interest rates. That does not mean it can't be regulated. There are a host of regulations that govern the Postal Service. The cornerstone is the complaint process, which allows the Commission to invalidate even our own regulations. But it does not make a price change. The problem I have with that is that from the point of view of the mailer, the person mailing stuff, without the discount, assuming no one changes, their costs for mailing greatly exceed the rate of inflation. They go way up. And that's what this was aiming, wasn't it? No. It was aimed at price changes. In that argument, they should be filing a complaint. And the reason that shouldn't be part of the price increase, you could never administer, because the cost to mailers would change from mailer to mailer. There is no way that Congress intended that to be resolved with millions of mailers in a 45-day process with a 20-day period for comment. That is much more appropriately done through the complaint process, through the service standard process, through the classification process. These are all tools in the Commission's tool belt. They're not only holding a hammer, and therefore should not treat everything we do as a nail. So your response to the other side, when you said the automation price is gone, is that doesn't affect the rate? It's not gone. It's still in the rate schedule. Whether somebody is going to – all we changed was the requirement for what you need to do to pay that rate. And as it turns out, if you qualify for that, you're also going to qualify for a discount. That doesn't mean we eliminated rate. If we did anything, we reduced rates. Well, can we explain that? I thought we agreed earlier – maybe I misunderstood you – that that basic intelligent rate can't be used anymore. There is no such thing as a basic intelligent rate, Your Honor. And if I wasn't clear before, I apologize. Okay, so then I don't understand your answer to Judge Edwards. What I'm saying is that what we have and what we still have is a basic – it's not a basic automation rate in terms of basic discount. We have a base automation rate. We have an automation rate. And we also offer a discount from that rate if you use a full-service intelligent mail barcode. But you can't use the intermediate one anymore. There is no intermediate one. All we're saying is that now you need to use a different barcode to qualify for the average rate. And if you do so, you are also going to qualify for the discount. There's nothing unusual. But you have to spend the money to do it, correct? Well, that's absolutely true. Whereas last year, you didn't have to do that. That is correct. We make those kind of changes all the time. If that were a price change, we would have price change cases before the commission probably on a monthly basis. We change requirements all the time. This is another one. It is not a price change. Okay, thank you. We'll take the case under advisement.
judges: Tatel, Wilkins, Edwards